AO 91 (Rev. 11/11) Criminal Complaint

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED
*May 06, 2025*

Nathan Ochsner, Clerk of Court

United States of America
v.
ALAN HAO HSU
aka HAOCHUN HSU

*Defendant(s)*

Case No. **4:25-mj-270**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of October 1, 2024, to May 6, 2025, in the county of Fort Bend in the Southern District of Texas, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 554 | Smuggling Goods from the United States |
| 13 U.S.C. § 305 | Submitting False Export Documents |
| 50 U.S.C. §§ 4819(a)(2)(F) and (G) | Making False Representations and Evading the Provisions of the Export Administration Regulations |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Tyler Fox, Special Agent, U.S. Dept. of Commerce
*Printed name and title*

Attested to by the complainant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 05/06/2025

*Judge's signature*

City and state: Houston, Texas

Hon. Richard W. Bennett, U.S. Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

4:25-mj-270

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

## Attachment A

I, Tyler Fox, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

I am a Special Agent with the United States Department of Commerce, Bureau of Industry and Security ("BIS"). I have been so employed since July 2024, and I am currently assigned to the Office of Export Enforcement's Forward Assigned Post – San Antonio, Texas. Prior to my employment with BIS, from 2020 until July 2024, I was a Special Agent with the U.S. Drug Enforcement Administration, St. Louis Division, where I participated in criminal investigations of drug trafficking and money laundering. As a BIS Special Agent, I am charged with investigating the unlawful export of goods and commodities controlled for export by the Department of Commerce, including firearms and technology, for reasons of national security and/or foreign policy. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations into alleged violations of federal law. Since joining BIS and the Office of Export Enforcement, I have investigated, among other things, violations of the Export Control Reform Act, 50 U.S.C. §§ 4801-4852 and the smuggling of goods from the United States, in violation of 18 U.S.C. § 554.

I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested Criminal Complaint. It does not set forth all my knowledge, or the knowledge of others, about this matter.

1

**RELEVANT STATUTES AND REGULATIONS**
*The Export Control Reform Act (ECRA) and the*
*Export Administration Regulations (EAR)*

1.  The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority to control "(1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. *Id*. at § 4812(b). ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id*. at § 4813(a).

2.  Pursuant to ECRA, the Department of Commerce reviews and controls the export of certain items, including commodities, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or re-exported lawfully from one foreign destination to another.

3.  The most sensitive items subject to EAR control are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical

characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

4. The EAR establish the responsibility of BIS to approve or deny export license applications with the input of other federal agencies. If a license is required for a transaction subject to the EAR and the transaction does not qualify for a specific license exception, a U.S. person must submit a license application to BIS and receive a license prior to engaging in the transaction. The license may be subject to certain terms and conditions defined by BIS or other federal agencies.

5. Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in paragraph (2)." Such unlawful acts include, among others, that: "[n]o person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by [ECRA and the EAR], or any order, license or authorization issued thereunder," including the unlicensed export or reexport of an item subject to the EAR and on the CCL, *see* 50 U.S.C. § 4819(a)(2)(A), 15 C.F.R. § 736.2(b)(1).

*Advanced Computing/Supercomputing Interim Final Rule (AC/S IFR)*

6. Beginning on October 7, 2022, BIS began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items, including certain Nvidia-manufactured Graphic Processing Units ("GPUs"), such as the H100 and H200 chips, through an interim final rule (effective on October 7, 2022). *See* 15 C.F.R. § 744.23; 87 Fed. Reg. 62186 (Oct. 7, 2022). The purpose of the rule is "to protect U.S. national security and foreign policy interests by

3

restricting the [People's Republic of China's] access to advanced computing for its military modernization, including nuclear weapons development, facilitation of advanced intelligence collection and analysis, and for surveillance." BIS further imposed additional export controls on certain advanced computing semiconductor chips (chips, advanced computing chips, integrated circuits, or ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List. These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence, with a total processing performance of 4800 or more, or a total processing performance of 1600 or more and a performance density of 5.92 or more. These controls and restrictions applied to China (including Hong Kong) and Macau.

7. On October 25, 2023, BIS released an interim final rule (effective on November 17, 2023) that expanded the export controls related to advanced computing and semiconductors, including with respect to additional Nvidia-manufacturer GPUs, such as the H800, which had been developed specifically for China following the October 7, 2022 restrictions. According to the interim final rule, "[t]hese revisions protect U.S. national security interests by further restricting China's ability to obtain critical technologies to modernize its military capabilities in ways that threaten the national security interests of the United States and its allies." 88 Fed. Reg. 73458 (Oct. 25, 2023).

*Export and Shipping Records*

8. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

9. The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file an accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. An EEI also is required, regardless of the value of the goods, if the goods require an export license. 15 C.F.R. §§ 758.1 and 30.2.

10. A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

11. Title 13, United States Code, Section 305, makes it a federal crime to knowingly fail to file or to knowingly submit false or misleading export information through the SED, EEI, or the AES, or to otherwise use the SED or the AES to further any illegal activity. Section 305 permits forfeiture penalties for any person who is convicted under this section, and such persons are subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

*Smuggling*

12. Title 18, United States Code, Section 554, states, "Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended

for exportation contrary to any law or regulation of the United States" shall be fined, imprisoned not more than 10 years, or both.

## FACTS IN SUPPORT OF PROBABLE CAUSE

13. Alan Hao HSU, aka Haochun HSU ("HSU") is the Director of HAO Global LLC ("HAO Global"), a company registered with the Texas State Comptroller in November 2014. The registered agent address was listed at a suite address on Southwest Freeway, Sugar Land, Texas (the "Southwest Freeway address") which was used as the "Invoice to" address on certain purchases conducted by HAO Global, as described herein. HAO Global's mailing address on file was an address in Missouri City, Texas, which records checks reveal to be HSU's personal residence ("HSU Residence").

14. According to registration records for the website www.hao-core.com, HSU (whose middle name is Hao) owns the website and registered it on or about March 12, 2025. The website is in the Chinese (Traditional) language and advertises AMD and NVIDIA GPUs, among other items. The site displays the email address Alan.Hsu@hao-core.com under the heading of "Contact." HSU's middle name is Hao. Registration records for hao-core.com showed "ALAN HSU" was the website owner. The domain-related information includes HSU's name, address, and telephone number.

15. U.S. Company 1 is a technology company that designs, manufactures, and markets electronics and related services, including servers containing GPUs manufactured by Nvidia that are controlled for export to China and Hong Kong.

16. On or about March 25, 2025, I visited the Southwest Freeway address and found the particular suite to which HAO Global is registered to be vacant. I contacted both the front

6

receptionist and leasing agent for the building and was informed that the particular suite had been vacant since at least 2022, and neither of them had heard of HSU or HAO Global.

17. Record checks revealed that neither HSU nor HAO Global applied for or possessed any export licenses.

*2024 Shipment to Hong Kong*

18. On or about October 1, 2024, HSU and U.S. Company 1 began negotiations for HSU to purchase Nvidia GPUs from U.S. Company 1. During these negotiations, HSU provided to U.S. Company 1 an end user certification stating in the fillable portion that the only "ship-to" country was "USA." HSU also notified U.S. Company 1 that the GPUs would remain within the United States. In response to a question from U.S. Company 1's legal department, on or about October 10, 2024, HSU responded to U.S. Company 1 with HAO Global's compliance procedures as follows:

> Hello [US Company-1 employee]
>
> Thank you for bringing this question from Legal to my attention.
>
> As Hao Global primarily provides repair services rather than reselling products, our compliance measures are focused on ensuring that repaired items remain within the U.S. unless otherwise authorized. Our procedures are as follows:
>
> a. Customer Due Diligence: We conduct basic checks on our customers to ensure they comply with U.S. regulations and are not listed on any restricted or denied-party lists. This allows us to verify that we are servicing legitimate customers.
>
> b. Service-Based Compliance: Since we provide repair services, the products we repair are typically returned to the original customer within the U.S. We clearly communicate to our customers that any products subject to U.S. export control regulations cannot be exported or resold outside the U.S. without proper authorization.
>
> c. Clear Communication: We regularly remind our customers of the restrictions associated with the products we repair, emphasizing that

> any products subject to U.S. regulations must remain in the U.S. unless proper export licenses are obtained.
>
> Additionally, regarding the [U.S. Company 1] project, all collaboration with Hao Global's partners is strictly based on U.S. Department of Commerce regulations and [U.S. Company 1]'s compliance requirements. These requirements have been formally communicated to all Hao Global partners through written documentation and contractual terms, ensuring full adherence to all relevant laws and compliance standards.
>
> By implementing these measures, we ensure compliance with U.S. legal requirements and prevent unauthorized export or transfer of restricted products. If you require further clarification or additional details, please feel free to contact me.
>
> Best regards,
> Alan

19. On or about October 17, 2024, HSU and U.S. Company 1 agreed to the purchase of 60 Nvidia HGX H100 GPU baseboard modules for $10.8 million (as discussed above and below, H100 GPUs required a license for export to China and Hong Kong as of October 7, 2022). Between October 23, 2024, and November 21, 2024, HSU made five payments to U.S. Company 1 totaling $10.8 million.

20. Despite HSU's representation to U.S. Company 1 that the order would remain in the United States and be used for HAO Global's "aftermarket service operation," investigators learned through freight forwarder records that these items were exported to Singapore on or about November 25, 2024 and transshipped to Hong Kong, China on or about November 27, 2024, without a legally required export license from the U.S. Department of Commerce. Moreover, the EEI filing attributed to the order claimed an ultimate destination of Singapore (i.e., the items were not going to be reexported) and misclassified the items as EAR99, falsely identifying the shipment as not being specifically described on the CCL. Based on my training and experience, this is a

commonly used tactic to conceal and obfuscate the true nature of the shipment to evade the U.S. export controls and hinder the ability to track the export of controlled GPUs.

21. A license determination based upon these facts was later completed by BIS. According to the contents per the invoice and production provided by U.S. Company 1, the items were classified under ECCN 4A090.a, meaning that the item is controlled for Anti-Terrorism (AT), National Security (NS), and Regional Stability (RS) reasons, "required a license per 742.6(a)(6)(iii)(A) and there is no license exception to the end user of China including Hong Kong."

22. After the shipment arrived in Hong Kong, U.S. Company 1, on or about December 9, 2024, asked HSU for end-user details on the 60 servers containing Nvidia H100 GPUs. HSU did not immediately respond. When U.S. Company 1 asked again the following day, HSU responded that a California-based company was his "downstream for first 60 units."

*2025 Shipment to Thailand*

23. On or about February 24, 2025, BIS's Office of Enforcement Analysis identified a shipment with EEI information summarized as below:

USPPI[1]: HAO Global – [HSU Residence]

---

[1] USPPI stands for U.S. Principal Party of Interest and is the person or entity who received the primary benefit from an export transaction; generally, the principals are the buyer and seller. *See* 15 C.F.R. § 30.1. The EEI shall be filed through the AES by the United States Principal Party In Interest (USPPI), the USPPI's authorized agent, or the authorized U.S. agent of the Foreign Principal Party In Interest (FPPI) for all exports of physical goods, including shipments moving pursuant to orders received over the Internet. *See* 15 C.F.R. § 30.2. The person who files the EEI to the AES must be in the United States at the time of filing. The person who transmits the EEI to the AES must be a certified AES participant in accordance with 15 CFR 30.5 of the FTR. The person who transmits EEI to the AES, whether exporter (U.S. principal party in interest) or agent, is responsible for the truth, accuracy, and completeness of the EEI, except insofar as that person can demonstrate that he or she reasonably relied on information furnished by others. *See* 15 C.F.R. § 758.1.

>Consignee: [A corporation in Thailand]
>Est. Export Date: 2/27/25
>ECCN: [blank]
>License code: C33/NLR
>Value: $6,656,000

24. Based on my initial review of the EEI, which included a description of computer servers, I observed that the "ECCN" line in the AES record was blank, and I understood "License Number: NLR" to mean that the export was being made "No License Required." Upon receipt of additional documents relating to this shipment, which included the description "GPU HGX H200," referring to Nvidia H200 GPUs,[2] which are on the CCL under ECCN 4A090.a, I detained this shipment. Furthermore, a destination control statement on the invoice from U.S. Company 1 regarding this shipment stated:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

25. On the shipment's invoice as listed by U.S. Company 1, HAO Global was the only "Customer name." The "Ship To" address on the invoice was a retail-style strip center in Houston, Texas. The bill of lading, however, revealed that the shipment was not shipped to this address, but rather picked up at U.S. Company 1 and taken to a freight forwarder's warehouse in Atlanta, Georgia, where it was presented for export.

26. The investigation supports there is probable cause to believe that the EEI filing contained misrepresentations, false statements, and concealed facts about the true nature of the shipment.

---

[2] The H200 is the newer and more advanced Nvidia GPU, building upon the H100. It was released in or about November 2024.

27. The pickup date on the bill of lading was February 27, 2025, the same date the EEI was completed by the freight forwarder, who used information HSU provided in a shipper's letter of instruction to fill out the EEI.

28. On or about February 18, 2025, the freight forwarder received an email from HSU:

> Hello [freight forwarder employee]
> I am Alan from HaoGlobal.
> My customer Kristy told me you will be in charge of pick up, ship from NC ([U.S. Company 1]) to Thailand.
> Please let me know if you are aware of this shipment and we can go over the detail.
> Alan Hsu

29. On or about February 19, 2025, the freight forwarder emailed HSU and requested additional information about the shipment such as weight, dimensions, address for the pick-up, commercial invoice and packing list. The freight forwarder also provided a blank shipper's letter of instruction ("SLI") for the shipment. On or about February 20, 2025, HSU responded to the freight forwarder with a completed SLI and the following message:

> Hello [freight forwarder employee]
> Please review attached for packing list, commercial invoice, and SLI.
> Please review, provide BOL, and Arrange Pick up ASAP.
> …
> Line: sp_nan
> Pick up address:
> [US Company-1] US FULFILLMENT Center
> [Address]
> Alan Hsu

30. The completed SLI returned by HSU listed HAO Global, LLC, as the U.S. Principal Party of Interest and a corporation in Thailand as the ultimate consignee and direct consumer. However, there was no consignee contact information provided. The ECCN field was also left blank, and the license field stated "nlr," (i.e., "no license required"). HSU signed the SLI as Director of HAO Global. The box above HSU's signature contains a disclaimer that reads:

11

> I certify that all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the "Correct Way to Fill Out the Shipper's Export Declaration." I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requested information or for violation of U.S. laws on exportation (13 U.S.C. Sec. 305; 22 U.S.C. Sec. 401; 18 U.S.C. Sec. 1001; 50 U.S.C. App. 2410

31. The shipment was part of a larger purchase order HSU placed with U.S. Company 1, which contained products controlled for export to China and Hong Kong, to be fulfilled in batches, some presented to U.S. Company 1 as domestic sales and some as for export. The end user certificate form that U.S. Company 1 issued to HAO Global pursuant to a purchase order, as referenced above and the only end-use certification on file for HAO Global at the time of the order later traced to Hong Kong, contained two full pages on export conditions and end-user/end-use prohibitions as well as the specific language that "items provided to you by [U.S. Company 1] may be subject to export controls under the laws and regulations of the United States and other applicable governments as required." It further specifies the responsibilities of the purchaser:

> [HAO Global] will immediately notify [US Company-1] of any changes to these responses (via email at [email]) or of transactions where we have knowledge of an export, reexport, or transfer (in country) of [US Company-1] products completed by us or entities acting on our behalf in non-compliance with this certification, [US Company-1] shall be excused from performance for declining to engage in any transaction not in compliance with this certification, all provisions of the EAR, or any other applicable laws and regulations.

HSU signed the certificate on behalf of HAO Global.

*Interview of HSU*

32. Subsequent to the detention of the February 2025 Thailand shipment, on or about March 25, 2025, I arrived at the HSU residence to conduct an industry outreach and to interview HSU. I told HSU I was there to discuss a shipping business; HSU responded that he did not have

one. When asked if he had a freight forwarding or export business, HSU responded positively to an export business. I asked if HSU was HAO Global, and HSU answered in the affirmative, stating that he formed HAO Global many years ago but did not use it until recently. HSU stated that he was involved in buying and reselling computer equipment, sometimes overseas but also within the United States.

33. I asked HSU about the February 2025 shipment to Thailand. HSU immediately responded "[i]t's not my shipment," but subsequently acknowledged that it was his shipment. I told HSU that the shipment's contents were export controlled and asked if HSU remembered the destination control statement on the invoice about export licensing. HSU replied no, stating it may have been "in the fine print." When I showed the signed BIS-711, an official US government document used to obtain a statement of ultimate consignee, to HSU and asked if he signed the document, HSU responded "it looks like my signature," but HSU would not confirm he signed it and said a lot was possible with technology.

34. When asked if he had ever purchased GPUs or Nvidia products before, HSU stated that the shipment to Thailand was the first time, but that he had purchased some bitcoin mining equipment, and those products had GPUs. HSU stated that he sold them within the United States and the Middle East. HSU stated that he never purchased GPUs for any business in Hong Kong because GPUs cannot be shipped to Hong Kong.

## CONCLUSION

35. Based on my training and experience, and further supported by the facts in this affidavit, I submit that there is probable cause to believe that Alan HSU had committed Making False Representations and Evading the provisions of the EAR, in violation of Title 50, United States Code, Section 4819(a)(2)(F) and (G); Smuggling of Goods from the United States, in violation of

Title 18, United States Code, Section 554; and Submitting False Export Documents, in violation of Title 13, United States Code, Section 305.

Respectfully submitted,

*T Fox*

Tyler Fox, Special Agent
U.S. Department of Commerce
Bureau of Industry and Security
Office of Export Enforcement

Subscribed and sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 6th day of May 2025, and I find probable cause.

*Richard W Bennett*

Hon. Richard W. Bennett
United States Magistrate Judge